UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
PAUL J. CARCHIDI,                                    Chapter 7
              DEBTOR.                                Case No. 13-17301-WCH

_____

MARK MANCINELLI,
              PLAINTIFF,
                                                     Adversary Proceeding
v.                                                   No. 14-1072

PAUL J. CARCHIDI,
              DEFENDANT.

_____

IN RE:
ERIC W. HAFNER,                                      Chapter 7
              DEBTOR.                                Case No. 13-17302-WCH

_____

MARK MANCINELLI,
              PLAINTIFF,
                                                     Adversary Proceeding
v.                                                   No. 14-1073

ERIC W. HAFNER,
              DEFENDANT.

_____

**MEMORANDUM OF DECISION**

## I. <u>INTRODUCTION</u>

The matters before the Court are two essentially identical motions for summary judgment

filed by the plaintiff Mark Mancinelli (the "Plaintiff")[1] in two separate adversary proceedings

and the objections thereto filed by the respective debtor-defendants Paul J. Carchidi ("Carchidi")

_____

[1] Because the facts of this case involve more than one member of the Mancinelli family, clarity dictates I use his title rather than name.

and Eric W. Hafner ("Hafner," collectively with Carchidi, the "Debtors").  Through his motion,

the Plaintiff seeks a determination that a debt owed to him by the Debtors is excepted from

discharge pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4), and/or (a)(6).  For the reasons set forth

below, I will deny the motions for summary judgment.

## II. BACKGROUND

### A. Preliminary Matters

From the outset, I note that the motions for summary judgment now before me, as well as

the adversary proceedings themselves, are essentially identical in all respects.  There are, of

course, slight variations on account of tailoring each pleading to either Carchidi or Hafner, but

even the Debtors' respective pleadings are nearly identical.  Therefore, for ease of reference, I

will cite to only those documents filed in the *Mancinelli v. Carchidi* adversary proceeding unless

there is a variation of substantive importance in the *Mancinelli v. Hafner* adversary proceeding.[2]

Next, pursuant to the Local Rule 56.1 of the United States District Court for the District

of Massachusetts, adopted and made applicable to proceedings in the Bankruptcy Court by

Massachusetts Local Bankruptcy Rule ("MLBR") 7056-1, motions for summary judgment must

include "a concise statement of the material facts of record as to which the moving party

contends there is no genuine issue to be tried, with page references to affidavits, depositions, and

other documentation."[3]  Here, Mancinelli filed the "Plaintiff's Concise Statement of Material

Facts of Record as to Which the Plaintiff Contends There is No Genuine Issue to be Tried" (the

"Plaintiff's Facts") which contain citations to forty-three exhibits, consisting of almost three

hundred pages of state court records, and an affidavit attached to the motions for summary

---

[2] Accordingly, all docket references are to Adv. Pro. No. 14-1072 unless otherwise stated.

[3] LR, D. Mass 56.1, adopted and made applicable to proceedings in the Bankruptcy Court by MLBR 7056-1.

judgment.[4]    The Plaintiff's Facts, however, are not in chronological order and paint an incomplete narrative of events.   The "Affidavit of Plaintiff Mark Mancinelli in Support of Motion for Summary Judgment" (the "Mancinelli Affidavit"), though substantially longer, suffers from the same failing.[5]   Further complicating matters is that the Plaintiff's List of Exhibits inaccurately identifies some exhibits, leaving me to wonder whether the wrong document was attached or the wrong description was provided.

Oppositions to summary judgment must similarly contain a statement of material facts to which the opposing party contends that there exists a genuine issue to be tried, with supporting references to the record.[6]   The Debtors filed the "Defendants Concise Statement of Disputed Facts Submitted in Opposition to Motion for Summary Judgment" (the "Disputed Facts").[7]   As will be explained in greater detail below, the few disputed facts largely contest whether certain property owned by the Plaintiff and his brother was inappropriately retained by the Debtors.   The Debtors also filed three affidavits attesting to facts not contained in either statement.

Material facts set forth in the moving party's statement, if adequately supported, are deemed admitted for purposes of summary judgment if not controverted by an opposing statement.[8]   Shortly after these matters were taken under advisement, however, the parties filed a Joint Pre-Trial Statement (the "Joint Statement") in each adversary proceeding containing a list of facts that "are admitted and require no proof."[9]   The admitted facts are largely identical to the

---

[4] Plaintiff's Facts, Docket No. 33.

[5] Mancinelli Affidavit, Docket No. 31-2 at ¶ 18.

[6] LR, D. Mass 56.1, adopted and made applicable to proceedings in the Bankruptcy Court by MLBR 7056-1.

[7] Disputed Facts, Docket No. 40.

[8] LR, D. Mass 56.1, adopted and made applicable to proceedings in the Bankruptcy Court by MLBR 7056-1.

[9] Joint Statement, Docket No. 46 at ¶ II.

Plaintiff's Facts which the Debtors did not dispute.  Notably, unlike those facts set forth in a statement of undisputed facts, admitted facts listed in the Joint Statement do not require citation or substantiation.

After thoroughly reviewing the submissions now before me, I have attempted to piece together a coherent narrative of the facts underlying the motions for summary judgment.  In some cases, it is unclear where certain facts fit within the timeline of events.  Other times, it is not entirely clear what is meant by the admitted statement.  To the extent necessary, the narrative has been embellished by reference to the various affidavits with the understanding that statements that do not appear in a concise statement of the material facts of record pursuant to the local rule are not deemed admitted for purposes of summary judgment.  Notwithstanding this effort, which should have been expended by the parties rather than the Court, gaps remain.[10]

B. Facts

Carchidi has resided at 46 Gifford Street in Brockton, Massachusetts (the "Property") since 1980.[11]  Although presently suspended for a definite term by the Massachusetts Board of Bar Overseers, Carchidi is an attorney and has practiced law out of a home office at the Property since 1980.[12]  In addition to his law practice, Carchidi was also the business manager of a band known as "The Lines," of which Hafner was a member.[13]

---

[10] *See Puerto Rico American Ins. Co. v. Rivera-Vazquez*, 603 F.3d 125, 131-132 (1st Cir. 2010) (parties cannot "expect[] the district court to do the party's homework."); *Rios-Jimenez v. Principi*, 520 F.3d 31, 38 (1st Cir. 2008) ("Local Rule 56 is intended to prevent parties from shifting to the . . . court the burden of sifting through the inevitable mountain of information generated by discovery in search of relevant material."); *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007) (parties should not leave the court to "grope unaided for factual needles in a documentary haystack.").

[11] *Id.* at ¶ II.1.

[12] Plaintiff's Facts, Docket No. 33 at ¶ 17;  Joint Statement, Docket No. 46 at ¶ II.3.

[13] Joint Statement, Docket No. 46 at ¶¶ II.6, 12.

Hafner has lived with Carchidi at the Property since approximately 1985.[14]  For the last thirteen years, Hafner has worked in the Rockland, Massachusetts Public Schools as school psychologist.[15]  Approximately five years ago, Hafner completed his Ph.D. in psychology.[16]

In the 1980's, Bruce Mancinelli, the Plaintiff's brother, operated a recording studio through a corporation known as Sound Design Studios, Inc. ("Sound Designs").[17]  Bruce Mancinelli acquired the studio equipment between 1982 and 1984 (the "Studio Equipment").[18] The Plaintiff asserts that he was the "co-owner or owner" of all the Studio Equipment purchased, and that he "owns/owned" all the shares of Sound Designs.[19]  Given these statements, it is unclear whether Bruce Mancinelli had an ownership interest in either Sound Designs or the Studio Equipment.

Hafner first met Bruce Mancinelli in the 1980's when The Lines recorded at his studio.[20] At this time, Carchidi represented the Plaintiff, Bruce Mancinelli, and Sound Designs in various legal matters.[21]  In particular, in October, 1988, he represented Sound Designs in an eviction action brought by its landlord.[22]  By this time, the Sound Designs' business had declined and

---

[14] *Id.* at ¶ II.2.

[15] *Id.* at ¶ II.14.

[16] *Id.* at ¶ II.14.

[17] Plaintiff's Facts, Docket No. 33 at ¶ 20.

[18] *Id.* at ¶ 20.

[19] *Id.* at ¶¶ 20-21.  Carchidi disputes the Plaintiff's claim that he owned or operated a studio, insisting that it was owned by Sound Design.  Disputed Facts, Docket No. 40 at ¶ 5.  At this time, this appears to be a distinction without a difference.

[20] Joint Statement, Docket No. 46 at ¶ II.11.

[21] *Id.* at ¶¶ II.4, 18.

[22] *Id.* at ¶ II.5.

Bruce Mancinelli was forced to close the studio.[23]   As a result, Bruce Mancinelli was left with the Studio Equipment and nowhere to store it.[24]   This marks the genesis of the present dispute.

On or about October 15, 1988, Carchidi agreed to allow Bruce Mancinelli to store the Studio Equipment in Carchidi's garage at the Property.[25]   According to the Plaintiff, Carchidi, knowing that Studio Designs was closing, offered to store the Studio Equipment and return it upon Bruce Mancinelli's request.[26]   Carchidi, on the other hand, maintains that he took possession of the Studio Equipment as security for unpaid fees for legal services provided to the Mancinelli family.[27]   I note, however, that Carchidi asserts that he was not representing the Plaintiff, Bruce Mancinelli, or their father, Mario Mancinelli, at the time he took delivery of the Studio Equipment.[28]

In the late 1980's, Carchidi also owned and operated Sideman Recording Studios ("Sideman Studios") from the Property, at which The Lines recorded.[29]   The Plaintiff alleges that instead of storing the Studio Equipment, Carchidi and Hafner used it to set up Sideman Studios.[30]   Carchidi appears to only dispute that the Studio Equipment was used to establish Sideman Studios, which, in his affidavit, he states was already operating with other equipment

---

[23] *Id.* at ¶ II.19.

[24] *Id.* at ¶ II.5; Plaintiff's Facts, Docket No. 33 at ¶ 6.

[25] Joint Statement, Docket No. 46 at ¶ II.4; Plaintiff's Facts, Docket No. 33 at ¶ 6.

[26] Plaintiff's Facts, Docket No. 33 at ¶ 24.

[27] Joint Statement, Docket No. 46 at ¶ II.7; Disputed Facts, Docket No. 40 at ¶¶ 1-2, 6, 8.

[28] Disputed Facts, Docket No. 40 at ¶ 3.

[29] Joint Statement, Docket No. 46 at ¶ II.6.

[30] Plaintiff's Facts, Docket No. 33 at ¶ 24.

that he and Hafner owned.[31]   There does not appear to be any dispute, however, that Carchidi used the Studio Equipment in conjunction with Sideman Studio's operations, as he concedes that Sound Design's chief engineer, Brad Szostek, "made more than a dozen visits to [the Property] to set up the [Studio Equipment] at the sole expense of Bruce Mancinelli."[32]

While Carchidi avers in his affidavit that Bruce Mancinelli instructed Szostek to install the Studio Equipment at the Property,[33] the Plaintiff suggests that he and Bruce Mancinelli were unaware that the Studio Equipment was being used and not simply stored.   The parties agree that the Plaintiff "located" an advertisement for Sideman Studios in a copy of Beat Magazine, a local musician's magazine, prior to October 4, 1989, but it is unclear whether this is intended to mean the Plaintiff discovered the existence of Sideman Studios at this time.[34]   In any event, at some point between October 15, 1988, and 1991, Bruce Mancinelli visited the Property and demanded the return of the Studio Equipment.[35]   Carchidi and Hafner refused.[36]

On September 28, 1990, Carchidi filed suit against the Plaintiff, Bruce Mancinelli, and Mario Mancinelli in the Brockton District Court seeking $40,000.00 for unpaid legal fees (the "Brockton Action").[37]   On the same date, he obtained an ex parte attachment in that amount against the Studio Equipment.[38]   Hafner was appointed a special process server in the Brockton

---

[31] Disputed Facts, Docket No. 40 at ¶ 2; Affidavit of Paul Carchidi in Opposition to Motion for Summary Judgment (the "Carchidi Affidavit"), Docket No. 38 at ¶ 10.

[32] Carchidi Affidavit, Docket No. 38 at ¶ 9.

[33] *Id.*

[34] Joint Statement, Docket No. 46 at ¶ II.20.

[35] *Id.* at ¶ II.8; Plaintiff's Facts, Docket No. 33 at ¶ 26.

[36] Joint Statement, Docket No. 46 at ¶ II.9; Plaintiff's Facts, Docket No. 33 at ¶ 26.

[37] Joint Statement, Docket No. 46 at ¶ II.21.

[38] *Id.*

Action.[39]  Ultimately, on March 20, 1991, the Brockton District Court dismissed Carchidi's complaint as "baseless and filed in bad faith," and awarded sanctions against Carchidi in the amount of $1,000.00.[40]

On March 5, 1992, Bruce Mancinelli and the Plaintiff filed suit against Carchidi and Hafner in the Middlesex Superior Court (the "Middlesex Action").[41]  In Count I of the complaint, they alleged that the Debtors converted the Studio Equipment, worth over $60,000.00, to their own use.[42]  In Count II, the Plaintiff and Bruce Mancinelli alleged that that Carchidi maliciously filed the Brockton Action against them knowing that no fees were due and owing, causing them to incur damages in the form of legal fees and lost business accounts.[43] Finally, in Count III, they further alleged that the ex parte attachment obtained by Carchidi, and for which Hafner was a special process server, constituted an abuse of process.[44]

The Middlesex Superior Court docket reflects that the Debtors each filed motions to dismiss the civil action—Carchidi under Mass. R. Civ. P. 12(b)(7) for failure to join Mario Mancinelli as a necessary party and Hafner under Mass. R. Civ. P. 12(b)(6) for failure to state a claim.[45]  These were also accompanied by motions for a more definite statement under Mass. R. Civ. P. 12(e).[46]  The Middlesex Superior Court denied the motions to dismiss, but allowed their

---

[39] *Id.* at ¶ II.13.

[40] *Id.* at ¶ II.21.

[41] Exhibit 13, Docket No. 34-3 at 1.

[42] *Id.* at 3-5.

[43] *Id.* at 5-6.

[44] *Id.* at 7.

[45] Exhibit 15, Docket No. 34-4 at 7-10.

[46] Exhibit 12, Docket No. 34-3 at 3.

motions for a more definite statement.[47]  The Plaintiff and Bruce Mancinelli filed a more definite statement of their claim on June 16, 1992, but the Debtors failed to answer.[48]  On October 14, 1992, upon the request of the Plaintiff and Bruce Mancinelli, the Middlesex Superior Court entered a default against the Debtors pursuant to Mass. R. Civ. P. 55(a).[49]

Thereafter, the Debtors repeatedly sought relief from the default, and later judgment, without success.  On November 12, 1992, the Debtors moved to remove the default under Mass. R. Civ. P. 60, blaming their attorney for their failure to file an answer timely and asserting that the more definite statement itself was untimely filed.[50]  The Middlesex Superior Court denied the motion on January 8, 1993.[51]  On February 8, 1993, they moved for reconsideration, which the Middlesex Superior Court denied on April 2, 1993.[52]  The Debtors appealed the denial of reconsideration on April 8, 1993.[53]  On June 24, 1993, the Middlesex Superior Court entered a Judgment Upon Assessment of Damages against the Debtors in the amount of $102,962.29, inclusive of interest.[54]  The Debtors appealed the judgment on June 30, 1993.[55]  While the prior appeals were pending, the Debtors filed three additional motions seeking relief from the judgment, all of which were denied by the Middlesex Superior Court and appealed by the

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] Exhibits 20 and 21, Docket No. 34-5 at 3-9.

[51] Exhibit 12, Docket No. 34-3 at 3.

[52] *Id.* at 4.

[53] *Id.*

[54] Exhibit 25, Docket No. 34-6 at 2.

[55] Exhibit 12, Docket No. 34-3 at 3.

Debtors.[56]   Ultimately, on May 5, 1997, the Massachusetts Court of Appeals disposed of all the outstanding appeals and affirmed the judgment of the Middlesex Superior Court.[57]

On December 31, 1997, the Middlesex Superior Court entered a Judgment After Rescript (the "Middlesex Judgment") which ordered that "the plaintiffs recover of the defendants the sum of $102,962.29 plus interest from June 5, 1993 to date in the sum of $55,805.56 plus costs."[58] On January 5, 1998, the Middlesex Superior Court issued an execution against the Debtors in the amount of $158,979.01 in damages and $280.30 in costs.[59]   Notwithstanding their victory, the Plaintiff states in his affidavit that the years of litigation with the Debtors left him and Bruce Mancinelli without the financial resources to pursue collection at that time.[60]

In his affidavit, Carchidi alleges that he settled with Bruce Mancinelli on June 17, 2000.[61] Carchidi's allegation is supported by the affidavit of Wayne Robertson, who was acquainted with all the parties through his involvement in the music industry.[62]   Robertson states that on June 17, 2000, he was at the Property and helped Carchidi and Hafner load the Studio Equipment into Bruce Mancinelli's truck.[63]   He further avers that he witnessed Bruce Mancinelli sign a release (the "Release") whereby Bruce Mancinelli accepted the return of the Studio Equipment, save an

---

[56] *Id.* at 4-5.

[57] Exhibit 31, Docket No. 34-7 at 13.

[58] Exhibit 32, Docket No. 34-7 at 15.

[59] Exhibit 12, Docket No. 34-3 at 5.

[60] Affidavit of Plaintiff Mark Mancinelli in Support of Motion for Summary Judgment ("Mancinelli Affidavit"), Docket No. 31-2 at ¶ 18.

[61] Carchidi Affidavit, Docket No. 38 at ¶¶ 11-12.

[62] Affidavit of Wayne Robertson in Opposition to Motion for Summary Judgment ("Robertson Affidavit"), Docket No. 38-2 at ¶ 1.

[63] *Id.* at ¶¶ 2-4.

Ampex ATR-102 tape deck which was left with Carchidi, in full settlement of the Middlesex

Judgment.[64]  The Release, which was attached to the motions for summary judgment, provides in

relevant part:

> I, Bruce Mancinelli, on behalf of myself, Mario Mancinelli, and Mark Mancinelli, Plaintiffs in Middlesex Superior Court Civil Action No. 92-1595, do hereby release and remise, now and forever, Defendants Paul Carchidi and Eric Hafner from all claims, judgments, causes of action, executions, claims and demand whatsoever, in law and in equity, past, present or future, by personal representative, successor, heir or assign, in exchange and in consideration of the return of the following recording equipment, which was at issue in the advove-stated lawsuit:
>
> [List of the Studio Equipment]
>
> Paul Carchidi shall retain the Ampex ATR102 inconsideration [sic] of storage of this equipment and legal work performed for me.
>
> I hereby acknowledge receipt of the above-listed recording equipment.
>
> I have read this document before signing it and I understand it.
>
> > [signature]    6/17/00
> > Bruce Mancinelli[65]

Carchidi asserts that all hostilities among the parties ceased following the settlement, and that

Bruce Mancinelli traveled with the Debtors when The Lines performed several concerts in

London.[66]  Bruce Mancinelli passed away on February 5, 2002.[67]

On March 12, 2012, the Plaintiff and the estate of Bruce Mancinelli filed an application

for supplementary process in the Brockton District Court against the Debtors (the

---

[64] *Id.* at ¶ 5; *see* Carchidi Affidavit, Docket No. 38 at ¶ 11.

[65] Exhibit 42, Docket No. 34-10 at 12.

[66] Carchidi Affidavit, Docket No. 38 at ¶¶ 13-15.

[67] Joint Statement, Docket No. 46 at ¶ II.16.  Carchidi notes that Mario Mancinelli and Brad Szostek are also deceased, but the record does not reflect when they passed.  Carchidi Affidavit, Docket No. 38 at ¶¶ 9, 19.

"Supplementary Process Action").[68]   The Debtors appeared before the Brockton District Court

on May 9, 2012, at which time they provided the Plaintiff with a copy of the Release for the first

time.[69]   The Plaintiff does not recognize the signature on the Release and believes that it is not, in

fact, Bruce Mancinelli's signature.[70]   He further states that, given that the Studio Equipment was

purchased between 1982 and 1984, it makes no sense that Bruce Mancinelli would release a

substantial judgment in exchange for equipment he could not use and that had little value by June

17, 2000.[71]   In any event, the Debtors concede that Bruce Mancinelli was never the Plaintiff's

agent and did not have authority to sign anything, including a release, on his behalf.[72]

The docket of the Supplementary Process Action, which was attached to the motions for

summary judgment, reflects that the Debtors opposed the Plaintiff's efforts.   They filed a motion

to dismiss the Supplementary Process Action on July 31, 2012, which the Brockton District

Court denied on November 14, 2012.[73]   The substance of that motion to dismiss or the court's

rationale for denying it are not in the record before me.   On November 13, 2012, however, the

Brockton District Court entered the following order:

> Based upon the testimony adduced at [the] hearing on November 9, 2012, this
> court orders the defendants, Paul J. Chirardi [sic] and Eric Hafner to make
> monthly payments of $250.00 and $300.00 respectively to plaintiff's attorney.
> Said funds are to be placed in an interest bearing escrow account to be opened by
> Mancinelli's counsel.   Payment shall commence on the 15th of December, 2012

---

[68] Exhibit 41, Docket No. 34-10 at 4.

[69] Joint Statement, Docket No. 46 at ¶ II.10.

[70] Plaintiff's Facts, Docket No. 33 at ¶ 31.

[71] Id. at ¶ 32.

[72] Id. at ¶ 33.

[73] Exhibit 41, Docket No. 34-10 at 5-6.

and will continue on a monthly basis thereafter subject to a final ruling by the Middlesex Superior Court.[74]

The Debtors sought to appeal the rulings of the Brockton District Court, but the appeal was dismissed as improper pursuant to Mass. Gen. Laws ch. 224, § 18.[75]  It is undisputed that the Debtors made "certain payments" to the Plaintiff.[76]

As prefaced above, there are significant gaps in the record.  For example, it is wholly unclear why the Brockton District Court made its November 13, 2012 order "subject to a final ruling by the Middlesex Superior Court" when the Middlesex Superior Court entered a final judgment nearly fifteen years earlier.  In his affidavit, the Plaintiff states that "[t]he Brockton Supplementary Process order permitted Carchidi and Hafner an opportunity to file a motion to vacate judgment or argue their release in the Middlesex Superior Court .."[77]  Similarly, in his memoranda in support of summary judgment, the Plaintiff states "[t]he [Brockton District Court] instructed Carchidi and Hafner to file a motion in Middlesex Superior Court to determine whether the matter was paid or settled . . . ."[78]  The Plaintiff does not cite any part of the record to corroborate these statements, and the Supplementary Process Action docket does not contain any reference to such an invitation/instruction by the Brockton District Court.[79]

---

[74] Exhibit 42, Docket No. 34-10 at 24.

[75] Exhibit 41, Docket No. 34-10 at 6.

[76] Joint Statement, Docket No. 46 at ¶ II.24.

[77] Mancinelli Affidavit, Docket No. 31-2 at ¶ 43 (partial ellipses in original).

[78] Memorandum in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memorandum"), Docket No. 32 at 9.

[79] I have reviewed the Plaintiff's exhibits and there is also no order or hearing transcript attached to the motions for summary judgment to support his assertions.

On April 8, 2013, the Plaintiff filed a motion to compel responses to post-judgment interrogatories and production of documents in the Middlesex Action.[80]   As the motion to compel was not attached to the motions for summary judgment, I have no information as to its contents.  The Debtors' opposition, which is in the record before me, cites the Release and the pendency of the Supplementary Process Action as grounds to deny the motion to compel.[81]   It appears the Middlesex Superior Court was similarly confused by the resumption of proceedings there as evidenced by its order denying the motion to compel:

> Motion (P#31) DENIED without prejudice to renewal in the Brockton District Court in conjunction with the supplementary process proceeding brought there by the plaintiff.  That Court held a hearing and issued an Order dated November 13, 2012 requiring payments to be made "subject to a final ruling by the Middlesex Superior Court."   It is unclear to me what "final ruling" is being awaited. Judgment has entered and an Execution was issued. It appear [sic] that under Rule 81(a)(2)(3) and (e) Mass. R. Civ. P. That the District Court may order whatever it deems necessary to complete the supplementary process proceeding. . . .   The plaintiff has sought and begun a supplementary process proceeding in the Brockton District Court and it is in that Court that this matter should be resolved.[82]

Litigation resumed in the Supplementary Process Action on October 28, 2013, when the Plaintiff filed the motion to compel there.[83]   On November 14, 2013, the Plaintiff filed a motion to, among other things, release the funds in escrow.[84]   The same day, the Debtors moved to dismiss the Supplementary Process Action, asserting that the Release discharged them of all claims arising from the Middlesex Judgment.[85]   After a motion hearing on November 22, 2013,

---

[80] Exhibit 12, Docket No. 34-3 at 6.

[81] Exhibit 40, Docket No. 34-9 at 24-25.

[82] Exhibit 12, Docket No. 34-3 at 6.

[83] Exhibit 41, Docket No. 34-10 at 6.

[84] *Id.* at 7.

[85] Exhibit 42, Docket No. 34-10 at 9-10.

the Brockton District Court entered an order denying the motion to dismiss and allowing the

motions to compel and release funds from escrow.[86]   The court's order does not offer any

rationale for the denial of the motion to dismiss, and a transcript of the hearing was not attached

to the motions for summary judgment.   Moreover, despite the Plaintiff's assertions that both

parties submitted expert reports to the Brockton District Court, there is, again, nothing in the

record before me to corroborate this contention.[87]

On December 30, 2014, they each filed a suggestion of bankruptcy in the Supplementary

Process Action.[88]

C. Procedural History

The Debtors each filed a separate voluntary Chapter 7 petition on December 23, 2013.[89]

Debora Casey was appointed Chapter 7 trustee in both cases and, after conducting the meetings

of creditors pursuant to 11 U.S.C. § 341, entered a Chapter 7 Trustee's Report of No Distribution

in each case on June 29, 2014.  Each Debtor received a discharge in June, 2014.

On March 28, 2014, the Plaintiff filed substantively identical adversary proceedings

against the Debtors asserting that the Middlesex Judgment is excepted from discharge pursuant

to 11 U.S.C. §§ 523(a)(2), (a)(4), and/or (a)(6).[90]   The Debtors each filed answers on April 29,

2014.  On June 26, 2014, I entered Pre-Trial Orders setting forth certain deadlines as requested

by the parties.   Although these adversary proceedings have never been formally consolidated,

---

[86] Exhibit 43, Docket No. 34-10 at 23.

[87] Plaintiff's Memorandum, Docket No. 32 at 9; Trans. Dec. 3, 2014 at 10:2-9.

[88] Exhibit 41, Docket No. 34-10 at 6.

[89] Hafner's case was assigned to Judge Joan N. Feeney.

[90] On April 10, 2014, Judge Feeney transferred *Mancinelli v. Hafner* to me so that it could be resolved in
conjunction with *Mancinelli v. Carchidi*.

both the Court and the parties have addressed all matters in parallel with the expectation that both adversary proceedings would be tried together.

The Plaintiff filed the motions for summary judgment on October 15, 2014, seeking judgment on all counts of his complaint. The Debtors filed their objections on November 19, 2014. I conducted a hearing on the motions for summary judgment on December 3, 2014, and, at the conclusion of oral arguments, took the matter under advisement. The parties subsequently filed the Joint Statement on December 15, 2014.

As a final note, the parties agree in the Joint Statement that the amount of the Middlesex Judgment, taking into account post-judgment interest, was $459,913.22 as of October 15, 2013.[91] In light of the Release, I understand this admission to be limited to the calculation of the outstanding balance the Middlesex Judgment assuming it remains due and owing.

## III. POSITIONS OF THE PARTIES

### A. The Plaintiff

From the outset, the Plaintiff maintains that all rulings arising from the Brockton Action, the Middlesex Action, and the Supplementary Process Action are entitled to preclusive effect in this adversary proceeding. He notes that all these cases involved the same parties and were fully litigated. Indeed, the Plaintiff insists that although the Debtors were defaulted in the Middlesex Action, both actually litigated the case as evidenced by the motion practice both before and after entry of the defaults, as well as the plethora of appeals they filed. He further states that the Debtors failed to, as instructed by the Brockton District Court, seek relief from the Middlesex Judgment in the Middlesex Superior Court. In any event, the Plaintiff contends that the validity of the release was fully litigated in the Supplementary Process Action, with each party

---

[91] Joint Statement, Docket No. 46 at ¶ II.23.

16

submitting expert witness reports, and the Brockton District Court ultimately denying the Debtor's motion to dismiss with prejudice.  With this in mind, the Plaintiff advances three theories under which the Middlesex Judgment is excepted from discharge.

First, the Plaintiff argues that the Middlesex Judgment is nondischargeable under 11 U.S.C. § 523(a)(2) as a debt arising from false representations or fraud.  In support, he asserts that Carchidi promised to store the Studio Equipment at the Property, when in fact he used it to set up his own recording studio and then refused to return it on demand.  Specifically, the Plaintiff contends that "Carchidi misrepresented his intentions to simply store the equipment and return the equipment," and "induced reliance by the Mancinellis to their detriment."[92]  He posits that his reliance was justified because Carchidi was their attorney and had earned their trust.

In further support of his claim of nondischargeability under 11 U.S.C. § 523(a)(2), the Plaintiff asserts that the Debtors engaged in a scheme to defraud him by use of the state courts.  He explains that Carchidi filed the Brockton Action, obtaining an ex parte attachment on the Studio Equipment, knowing that fees he claimed were not actually due.  The Plaintiff alleges that Hafner was the intended beneficiary of the lawsuit and contends that these actions demonstrate that the Debtors intended to use Carchidi's position as the Plaintiff's attorney to induce reliance and, ultimately, convert the Studio Equipment.

Next, the Plaintiff urges that the Middlesex Judgment is nondischargeable under 11 U.S.C. § 523(a)(4).  While the complaint alleges that the Debtors committed embezzlement or larceny, his arguments at summary judgment focus on characterizing the Middlesex Judgment as a debt arising from fraud or defalcation while acting in a fiduciary capacity.  To that end, the Plaintiff argues that Carchidi, as his lawyer, acted in a fiduciary capacity subject to an express

---

[92] Plaintiff's Memorandum, Docket No. 32 at 3.

trust agreement when he promised to store and return the Studio Equipment.  By keeping the Studio Equipment and initiating a lawsuit aimed at keeping it, the Plaintiff asserts that Carchidi breached his fiduciary duties.  The Plaintiff further contends that the Middlesex Superior Court expressly found that Carchidi breached his fiduciary duties and such a finding is entitled to preclusive effect in this proceeding.  Similarly, he posits that Hafner, although not an attorney, was also a fiduciary due to his promise to store the Studio Equipment and the preclusive effect of the Middlesex Superior Court's findings.

Finally, the Plaintiff argues that the Middlesex Judgment is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).  He contends that the evidence submitted "plausibly establishes" that Carchidi willfully injured the Plaintiff's property by deceiving the Mancinellis into transferring possession of the Studio Equipment to the Debtors, refusing to return it on demand, and suing them to retain it.  In support, the Plaintiff points to the findings of the Middlesex Superior Court which concluded that he suffered from abuse of process and malicious prosecution in the Brockton Action.

B. The Debtors

The Debtors maintain that there are material questions of fact that preclude summary judgment.  To start, they assert that collateral estoppel does not apply in this case because there is no identity of issues between 11 U.S.C. § 523(a)(2), (4), and (6) and the proceedings in the Brockton District Court and the Middlesex Superior Court.  The Debtors argue that although the Mancinellis brought a Count labeled "conversion" in the Middlesex Action, there were no allegations in the complaint that would satisfy the elements of a nondischargeability action.

With respect to 11 U.S.C. § 523(a)(2), the Debtors assert that there is no evidence that Carchidi did not intend to return the Studio Equipment at the time he took possession of it.  To

18

the contrary, they contend that in October, 1988, Carchidi intended to hold the Studio Equipment as a security for unpaid fees. Moreover, the Debtors note that there was no debt at the time the Studio Equipment was delivered.

The Debtors also assert that the Plaintiff is not entitled to summary judgment under 11 U.S.C. § 523(a)(4). Noting that 11 U.S.C. § 523(a)(4) requires trust-like obligations and not just a breach, the Debtors argue that Carchidi was not acting as a fiduciary of the Mancinellis when he took possession of the Studio Equipment, but instead was simply doing them a favor. Because the Mancinellis delivered the Studio Equipment voluntarily, the Debtors urge me to find that there was no larceny. Similarly, they contend there was no embezzlement because there was no fraudulent intent in retaining the Studio Equipment as security for Carchidi's unpaid fees.

Finally, with respect to the Plaintiff's claim under 11 U.S.C. § 523(a)(6), the Debtors argue that there was no intent to injure either the Plaintiff or his brother, nor was there a substantial certainty any injury would occur. Moreover, they posit that they were justified in taking possession of the Studio Equipment as it was done at Bruce Mancinelli's request.

Notably, the Debtors do not assert the release as a defense to the motions for summary judgment. Indeed, during oral arguments, Debtors' counsel indicated that "the issue of the release or not the release . . . that's not part of this . . . whole [§] 523 complaint . . . ."[93]

## IV. DISCUSSION

### A. The Summary Judgment Standard

Pursuant to Fed. R. Civ. P. 56, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[93] Trans. Dec. 3, 2014 at 13:3-5.

judgment as a matter of law."[94]   "A 'genuine' issue is one supported by such evidence that 'a reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party."[95]   Material facts are those having the potential to affect the outcome of the suit under the applicable law.[96]

The party seeking summary judgment "always bears the initial responsibility . . . of identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which demonstrate the absence of a genuine issue of material fact."[97]   The nonmoving party must then "produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'"[98]   A trialworthy issue cannot be established by "conclusory allegations, improbable inferences, and unsupported speculation."[99]   The Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.[100]

The United States Court of Appeals for the First Circuit has explained this provision to mean that the absence of a material factual dispute is a necessary condition, but not a sufficient

---

[94] Fed. R. Civ. P. 56(a) made applicable in adversary proceedings by Fed. R. Bankr. P. 7056.

[95] *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d. 1, 2 (1st Cir. 1999) (*quoting Smith v. F.W. Morse & Co., Inc.*, 76 F.3d 413, 428 (1st Cir. 1996)).

[96] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 314-315 (1st Cir. 1995); *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993).

[97] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.

[98] *Triangle Trading Co.*, 200 F.3d at 2 (*quoting Morris v. Gov't Dev't Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994)).

[99] *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990) (*quoting Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

[100] *Nicolo v. Philip Morris, Inc.*, 201 F.3d 29, 33 (1st Cir. 2000).

one for summary judgment.[101]   The moving party, therefore, must show that it is entitled to judgment as a matter of law.[102]

B. Collateral Estoppel

"The principle of collateral estoppel, or issue preclusion, bars relitigation of any factual or legal issue that was actually decided in previous litigation 'between the parties, whether on the same or a different claim.'"[103]   The doctrine of collateral estoppel applies in dischargeability proceedings in bankruptcy.[104]   In determining whether a party should be estopped from re-litigating an issue decided in a prior state court action, the bankruptcy court must look at that state's law of collateral estoppel.[105]   Under Massachusetts law, in order for collateral estoppel to apply, a court must determine that:

(1) there was a valid and final judgment on the merits;
(2) the party against whom estoppel is asserted was a party (or in privity with a party) to the prior litigation;
(3) the issue in the prior adjudication is identical to the issue in the current litigation; and
(4) the issue in the prior litigation was essential to the earlier judgment.[106]

The "'guiding principle' in determining whether to allow a party the use of collateral estoppel is whether the party against whom it is asserted had a 'full and fair opportunity to litigate the issue in the first action or whether other circumstances justify affording him an opportunity to

---

[101] *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994).

[102] *Id.*

[103] *Grella v. Salem Five Cents Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994) (*quoting* Restatement (Second) of Judgments, § 27 (1982)).

[104] *Grogan v. Garner*, 498 U.S. 279, 285 n. 11 (1991).

[105] *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 33 (1st Cir. 2001).

[106] *McHeffey v. Pereira (In re Pereira)*, 428 B.R. 276, 281 (Bankr. D. Mass. 2010) (*citing Alba v. Raytheon Co.,* 441 Mass. 836, 843, 809 N.E.2d 516, 521 (2004)); *see also Smith Barney, Inc. v. Strangie* (*In re Strangie*), 192 F.3d 192, 194 (1st Cir. 1999).

relitigate the issue.'"[107]    Therefore, as recognized by Judge Hoffman of this district in *In re Tardugno*,[108] there is

> [a] fifth and overarching element is that the issue was "actually litigated" which has been defined to mean the issue was subject to an adversary presentation and consequent judgment that was not "a product of the parties' consent and is a final decision on the merits."[109]

In light of these principles and in particular this "fifth element," applying collateral estoppel to default judgments, which typically arise in the absence of a full adjudication, raises special considerations.    While it is well-established that such treatment is within the court's discretion,[110] default judgments are generally not given collateral estoppel effect under Massachusetts law.[111]    In *Treglia v. MacDonald*, the Supreme Judicial Court of Massachusetts, in response to a question certified to it under S.J.C. Rule 1:03 by the United States Bankruptcy Appellate Panel for the First Circuit, "reaffirm[ed] that preclusive effect should not be given to issues or claims that were not actually litigated in a prior action."[112]    Nevertheless, the Supreme Judicial Court, relying on the comment e to the Restatement (Second) of Judgments § 27,[113] recognized in closing:

> We caution that, even in the case of a judgment entered by default, there may be some circumstances in which an issue may be given preclusive effect in subsequent litigation between the same parties. We can, for example, envision

---

[107] *Treglia v. MacDonald*, 430 Mass. 237, 241, 717 N.E.2d 249, 253 (1999) (citation omitted).

[108] *Birch Hollow, LLC v. Tardugno (In re Tardugno)*, 510 B.R. 12, 20 (Bankr. D. Mass. 2014) (*quoting Keystone Shipping Co. v. New England Power Co.*, 109 F.3d 46, 52 (1st Cir. 1997)).

[109] *Id.*

[110] *Int'l Strategies Group, Ltd. v. Pomeroy (In re Pomeroy)*, 353 B.R. 371, 376 (Bankr. D. Mass. 2006) (*citing Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979)).

[111] *Treglia v. MacDonald*, 430 Mass. at 241.

[112] *Id.*

[113] Restatement (Second) of Judgments § 27 comment e, at 256 (1982).

circumstances in which a litigant may so utilize our court system in pretrial procedures, but nonetheless be defaulted for some reason, that the principle and rationale behind collateral estoppel would apply. *See, e.g., Matter of Gober*, 100 F.3d 1195 (5th Cir. 1996) (holding that default judgment based on failure to answer does not support issue preclusion but where default issued as discovery sanction against defendant debtor after two years of litigation in which defendant had answered and denied all allegations of complaint, collateral estoppel applied); *In re Bush*, 62 F.3d 1319, 1324 (11th Cir. 1995) (applying collateral estoppel effect to prior default judgment against debtor based on fraud, where debtor "actively participated" in adversary process for almost one year through filing answer, counterclaim, and discovery requests). We need not specify here the circumstances in which our general rule would not be applicable, because the facts of this case fully support the decision of the judge of the bankruptcy court that the application of collateral estoppel is not appropriate to the Treglias' claim of fraud.[114]

Mindful of these observations, bankruptcy courts within this district have held "that the 'actual litigation' requirement of collateral estoppel may be satisfied if the party actively or substantially participated in the proceedings prior to the entry of a default judgment."[115] This is in line with other federal courts who have applied collateral estoppel where the defendant actively or substantially participated in the proceedings prior to the entry of a default judgment or avoided participating in the proceeding as part of a litigation tactic.[116] As explained by the Panel in *In re Stanley-Snow*, "if a party was afforded a reasonable opportunity to defend in the prior action but chose not to do so, the party could have reasonably foreseen the consequences of

---

[114] *Treglia v. MacDonald*, 430 Mass. at 242-243.

[115] *Backlund v. Stanley-Snow (In re Stanley-Snow)*, 405 B.R. 11, 20 (B.A.P. 1st Cir. 2009). *See Acevedo v. Wells Fargo (In re Acevedo)*, No. 10-43723-MSH, 2015 WL 1876857, at *3 (Bankr. D. Mass. Apr. 21, 2015); *D'Amour v. Birchall (In re Birchall)*, 501 B.R. 142, 149 (Bankr. D. Mass. 2013); *Int'l Strategies Group, Ltd. v. Pomeroy (In re Pomeroy)*, 353 B.R. 371, 376 (Bankr. D. Mass. 2006) (*citing Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979)).

[116] *See e.g. Gober v. Terra + Corporation (Matter of Gober)*, 100 F.3d 1195 (5th Cir. 1996)(default issued against defendant after two years of litigation in which the defendant had answered and denied all allegations of the complaint); *Bush v. Balfour Beatty Bahamas, Ltd.* (*In re Bush*), 62 F.3d 1319, 1324 (11th Cir. 1995)(applying collateral estoppel effect to prior default judgment against debtor based on fraud, where debtor "actively participated" in adversary process for almost one year through filing an answer, counterclaim, and discovery requests); *FDIC v. Daily* (*In re Daily*, 47 F.3d 365, 368 (9th Cir. 1995)(applying collateral estoppel where "denying preclusive effect to the [prior] judgment…would permit [debtor] to delay substantially and perhaps ultimately avoid payment of the debt by deliberate abuse of the judicial process").

not defending the action and it would be 'undeserved' to give a 'second bite at the apple when he knowingly chose not to defend himself in the first instance.'"[117]  Still, as observed by the United States District Court for the District of Massachusetts in *Dawe v. Capital One Bank*:[118]

> The courts that have applied issue preclusion to default judgments have all shared a common pattern: "[a] penalty default was entered as a discovery sanction against a defendant sued for fraud. The defendant then sought to discharge the judgment in bankruptcy." *See* 18A Charles A. Wright, et al., Federal Practice and Procedure, § 4440, at 212 (2002). This willingness to apply issue preclusion to default judgments in these cases "may be justified by the peculiar concerns of bankruptcy administration and procedural control described in the opinions." Id. Also common to these cases is the fact that the default judgment was entered in response to egregious "abuse of the judicial process." *In re Bush*, 62 F.3d at 1324.[119]

Here, the Plaintiff asserts that all the orders and judgments of the state courts are entitled to preclusive effect in this adversary proceeding.  "'To meet this burden, the moving party must have pinpointed the exact issues litigated in the prior action and introduced a record revealing the controlling facts.'"[120]  Due to the unique characteristics of each judgment, they must be analyzed separately.

### 1. The Dismissal of the Brockton Action

On March 20, 1991, the Brockton District Court dismissed Carchidi's complaint against the Plaintiff, Bruce Mancinelli, and Mario Mancinelli seeking $40,000.00 for unpaid fees as "baseless and filed in bad faith," and awarded sanctions against him.[121]  Without question, this clearly constitutes a valid and final judgment on the merits of Carchidi's complaint.  The second

---

[117] *In re Stanley-Snow*, 405 B.R. at 20 (*citing Bush*, 62 F.3d at 1324).

[118] *Dawe v. Capital One Bank*, 456 F. Supp. 2d 236, 242 (D. Mass. 2006).

[119] *Id.*

[120] *B.B. v. Bradley (In re Bradley)*, 466 B.R. 582, 586 (B.A.P. 1st Cir. 2012) (*quoting Honkanen v. Hopper (In re Honkanen)*, 446 B.R. 373, 382 (B.A.P. 9th Cir. 2011)).

[121] Joint Statement, Docket No. 46 at ¶ II.21.

element of the collateral estoppel test is also easily satisfied as to Carchidi and the Plaintiff because they were both parties to the Brockton Action.  While Hafner was not a party to the Brockton Action, the record before me, including the subsequent Middlesex Judgment as will be discussed below, establishes that he was "in privity" with Carchidi for purposes of the Brockton Action.

The final two elements of collateral estoppel consider the purpose for which the doctrine is asserted.  As part of the Debtors' defense of this adversary proceeding, they assert that they took possession of and retained the Studio Equipment as security for unpaid legal fees owed to Carchidi by the Mancinellis.  The Plaintiff argues that this defense has been foreclosed by the Brockton District Court's dismissal of Carchidi's complaint.  I disagree.

The Brockton District Court's finding that Carchidi's claim was "baseless and filed in bad faith" necessarily establishes that as of September 28, 1990, Carchidi knew or should have known that the Mancinellis did not owe any him outstanding legal fees, and that he knowingly commenced the Brockton Action in an attempt to collect fees that were not due.[122]  Nevertheless, it is not apparent from the record before me that the Brockton District Court made any determination of the Debtors' intent as of the time they took possession of the Studio Equipment. Accordingly, the Debtors are not collaterally estopped from asserting that they initially took possession of the Studio Equipment to secure unpaid legal fees owed to Carchidi by the Mancinelli family.

2. The Middlesex Judgment

The Middlesex Judgment, which awarded the Plaintiff and Bruce Mancinelli damages in "the sum of $102,962.29 plus interest from June 5, 1993 to date in the sum of $55,805.56 plus

---

[122] *Id.*

cost" from the Debtors, underlies the Plaintiff's claim in this adversary proceeding.[123]   For that reason, it is clear that the factual issues surrounding the Middlesex Judgment, at least in so far as they establish liability, are identical to those raised in the complaint.[124]   Similarly, there can be no dispute that the Plaintiff and the Debtors are the same parties from the Middlesex Action.

The two remaining elements—that there was a valid and final judgment on the merits and the issues in the prior litigation was essential to the earlier judgment—which also encompass the core of the overarching "actually litigated" requirement, are problematic.   The Middlesex Judgment is a default judgment and, as discussed above, default judgments are not always afforded preclusive effect.   In an attempt to address the "actually litigated" requirement, the Plaintiff points to the plethora of motions and appeals filed by the Debtors in the Middlesex Action and argues that this unquestionably establishes their "substantial participation."   Having carefully reviewed the record before me, I cannot agree.

The central flaw in the Plaintiff's logic is that the exception, if it is to be applied at all, only applies where "the party actively or substantially participated in the proceedings *prior to the entry of a default judgment*."[125]   Prior to being defaulted in the Middlesex Action for failing to file an answer, the Debtors fired off an initial salvo of motions consisting of two motions for a more definite statement under Mass. R. Civ. P. 12(e), Carchidi's motion to dismiss for failure to join a necessary party, and Hafner's motion to dismiss for failure to state a claim.   Each of these motions was procedural in nature and did not speak to the merits of the case.   Moreover, the Debtors' repeated efforts to obtain relief from the default, and later the Middlesex Judgment,

---

[123] Exhibit 32, Docket No. 34-7 at 15.

[124] Whether those facts satisfy the elements of a nondischargeable debt under 11 U.S.C. §§ 523(a)(2), (a)(4), or (a)(6) is a separate and distinct inquiry.

[125] *In re Stanley-Snow*, 405 B.R. at 20 (emphasis added).

focused solely on appropriateness of the initial default.  From the record before me, it does not appear that the merits of the Plaintiff's complaint were ever addressed in the Middlesex Action.

Ultimately, the facts of this case track more closely with *Treglia v. MacDonald* than any of those where the exception to the general rule has been applied.  In *Treglia*, the plaintiffs commenced a civil action for fraud in the superior court against the defendant and obtained an ex parte real estate attachment.[126]  Although the defendant promptly sought to discharge the attachment, he did not file an answer.[127]  This resulted in the defendant being defaulted and, after he did not participate in the hearing on the assessment of damages, a default judgment for over $94,000.00 entered against him.[128]  The defendant then filed a Chapter 7 petition, prompting the plaintiffs to commence an adversary proceeding seeking to except the judgment from discharge.[129]  The bankruptcy court declined to apply collateral estoppel, and ruled that the plaintiffs had failed to sustain their burden of proof.[130]  On appeal, the Panel, noting that this was not a "simple no-appearance, no answer default," was uncertain how Massachusetts law applied in the case and certified the question to the Supreme Judicial Court.[131]  As explained above, the Supreme Judicial Court concluded "the facts of this case fully support the decision . . . that the application of collateral estoppel is not appropriate to the Treglias' claim of fraud."[132]

---

[126] *Treglia v. MacDonald*, 430 Mass. at 238.

[127] *Id.*

[128] *Id.*

[129] *Id.* at 238-239.

[130] *Id.* at 239.

[131] *Id.* at 241.

[132] *Id.* at 243.

Like *Treglia v. MacDonald*, the Middlesex Action was not a "simple no-appearance, no answer default," but there is similarly no evidence to suggest that any issue of liability was ever "actually litigated."[133]   Moreover, there is nothing in the record before me to support the assertion that the defaults arose as a sanction for an egregious "abuse of the judicial process," thus likening it to one of the cases finding an exception to the general rule.[134]   Accordingly, I conclude that the issues raised in the Middlesex Action were not "actually litigated" and, therefore, the Debtors are not precluded from litigating those issues in this adversary proceeding.

3. The Supplementary Process Action

The final order which the Plaintiff contends is entitled to preclusive effect is the Brockton District Court's order denying the Debtors' motion to dismiss in the Supplementary Process Action.   He asserts that collateral estoppel bars the Debtors from relitigating the validity of the Release.   The Debtors, however, have not raised the Release as a defense to the motion for summary judgment and have taken the position that the Release is unrelated to this adversary proceeding.[135]   Therefore, the issue is moot.[136]

C. Nondischargeability under Section 523(a)

In accordance with the Bankruptcy Code's "fresh start" policy. "[e]xceptions to discharge are narrowly construed.[137]   Thus, to prevail in an adversary proceeding brought under 11 U.S.C.

---

[133] *Id.* at 241.

[134] *Dawe v. Capital One Bank*, 456 F. Supp. 2d at 242 (*quoting In re Bush*, 62 F.3d at 1324).

[135] *See* Trans. Dec. 3, 2014 at 13:3-5.  Moreover, the Debtors indicated in the Joint Statement that they would not be calling an expert witness to testify at trial notwithstanding the expert report already filed by the Plaintiff.  *See* Joint Statement, Docket No. 46 at 6; *see also* Plaintiff's Rule 26(a)(2)(B) Expert Report by James L. Streeter, Docket No. 29.

[136] While I need not reach the issue, I note that an order denying a motion to dismiss is not a final judgment. Moreover, the record before me does not support the Plaintiff's assertion that both parties submitted expert reports to the Brockton District Court.

[137] *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).

§ 523(a), the Plaintiff must prove each and every element of an exception to discharge by a preponderance of the evidence.[138]   Indeed, "the claimant must show that his 'claim comes squarely within an exception enumerated in Bankruptcy Code § 523(a).'"[139]

In pressing his motions for summary judgment, the Plaintiff relied heavily on the alleged preclusive effect of the various state court orders, most notably the Middlesex Judgment. Because I have already concluded that collateral estoppel does not apply to the Middlesex Judgment, genuine issues of material fact exist with respect to most of the elements under each of the exceptions to discharge the Plaintiff asserts.   I will address each briefly.

1. Nondischargeability under Section 523(a)(2)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a debt "for money, property, services, or an extension, renewal, or refinancing of credit" is excepted from discharge "to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ."[140]   In *Palmacci v. Umpierrez*,[141] the United States Court of Appeals for the First Circuit established the following six factor test to determine to determine whether a debt was obtained by false pretenses, false representation, or actual fraud:

(1) the debtor made a knowingly false representation or one made in reckless disregard of the truth;

(2) the debtor intended to deceive;

(3) the debtor intended to induce the creditor to rely upon the false statement;

(4) the creditor actually relied upon the misrepresentation;

---

[138] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

[139] *Palmacci v. Umpierrez*, 121 F.3d at 786 (*quoting Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir.1994), *overruled on other grounds by Field v. Mans*, 516 U.S. 59, 70–71 (1995)).

[140] 11 U.S.C. § 523(a)(2)(A).

[141] *Palmacci v. Umpierrez*, 121 F.3d at 786.

(5) the creditor's reliance was justifiable; and

(6) the reliance upon the false statement caused damage.[142]

The first two elements of the test describe the conduct and scienter required to show fraudulent conduct, while the last four elements embody the requirement the creditor's claim must arise directly from the debtor's fraud.[143]

At the present stage, the Plaintiff has failed to establish the threshold element under 11 U.S.C. § 523(a)(2)(A)—that the Debtors made a knowingly false representation or one made in reckless disregard of the truth. The falsity or recklessness of the representation is measured at the time it is made.[144] If the Debtors honestly intended to perform as promised, but subsequently decided they could not or would not perform, then the representation was not false.[145]

Here, the parties agree that Carchidi agreed to store the Studio Equipment in his garage at the Property on October 15, 1988.[146] Beyond that, however, there is a genuine issue of material fact regarding the understanding of the parties at the time of this agreement. The Plaintiff alleges the Debtors stored the Studio Equipment as a favor and promised to return it upon Bruce Mancinelli's request.[147] In contrast, Carchidi maintains that he took possession of the Studio Equity as security for unpaid fees for legal services provided to the Mancinelli family.[148] As

---

[142] *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (footnote omitted) (*citing Palmacci v. Umpierrez,* 121 F.3d at 786).

[143] *Id.*

[144] *Id.* at 786.

[145] *Id.* at 787.

[146] Joint Statement, Docket No. 46 at ¶ II.4; Plaintiff's Facts, Docket No. 33 at ¶ 6.

[147] Plaintiff's Facts, Docket No. 33 at ¶ 24.

[148] Disputed Facts, Docket No. 40 at ¶¶ 1-2, 6, 8.

discussed above, the Brockton District Court's findings do not preclude the possibility the Studio Equipment was initially stored as a security for unpaid legal fees that were outstanding two years earlier.

Even assuming, *arguendo*, that the Studio Equipment was not stored as a security as the Debtors contend, the Plaintiff still has not set forth facts necessary for me to conclude that they possessed the requisite scienter on October 15, 1988. This element requires "intent to deceive, manipulate, or defraud."[149] Therefore, even if the Debtors ultimately converted the Studio Equipment to their own use, it does not necessarily follow that they deceived the Mancinellis at the outset.

For these reasons, the Plaintiff is not entitled to judgment as a matter of law with respect to 11 U.S.C. § 523(a)(2)(A).

## 2. Nondischargeability under Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides, in relevant part, "[a] discharge under section 727 . . . does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[150]

To establish fraud or defalcation while acting in a fiduciary capacity, the Plaintiff must show: (1) that the debt "result[s] from a fiduciary's defalcation under an express or technical trust;" (2) that the debtor "acted in a fiduciary capacity with respect to the trust;" and (3) that the transaction in question is a "defalcation [or fraud] within the meaning of bankruptcy law."[151] Fiduciary capacity under 11 U.S.C. § 523(a)(4) is determined by federal law,[152] and must arise

---

[149] *Palmacci v. Umpierrez*, 121 F.3d at 787.

[150] 11 U.S.C. § 523(a)(4).

[151] *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 687 (B.A.P. 1st Cir. 2012) (internal quotations omitted).

[152] *Id.*

from "an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt."[153]  The fiduciary relationship that exists between an attorney and his client under Massachusetts law, without more, does not fit within this narrow construction.[154]  "Nevertheless, an attorney may be considered to be acting in a fiduciary capacity for purposes of § 523(a)(4) if the attorney is entrusted with client funds or property."[155]

Although there is disagreement as to the circumstances under which the Debtors took possession of the Studio Equipment, the record before me suggests that Carchidi was acting in a fiduciary capacity.  Carchidi disputes the Plaintiff's assertion that he was representing any of the Mancinellis at the time he took possession of the Studio Equipment,[156] but urges that he retained it as security for unpaid fees for legal services provided to the Mancinelli family.[157]  If, however, the Studio Equipment was held as collateral for unpaid legal fees, then Carchidi cannot simultaneously disclaim an attorney-client relationship and the trust-like duties attendant to the entrustment of client property.[158]  As Hafner is not an attorney, the same rationale would not

---

[153] *Stallworth v. McBride (In re McBride)*, 512 B.R. 103, 113 (Bankr. D. Mass. 2014) (*quoting Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir. 1997)).

[154] *Id.*

[155] *Id.  See Anderson v. Ingeneri (In re Ingeneri)*, 321 B.R. 601, 604–605 (Bankr. D. Me. 2005) ("When client property is entrusted to an attorney, the attorney-client relationship, which would otherwise be a fiduciary relationship based upon special knowledge, skills, and expectations, becomes, in addition to that, a technical trust relationship. With the entrustment of property, an attorney automatically takes on the duties (i.e. 'fiduciary capacity') of a trustee. These trust duties are in addition to the ordinary fiduciary duties attendant upon a purely service based (e.g. litigation) attorney-client relationship. It is the entrustment of property which superimposes a technical trust upon the attorney-client relationship and it is the existence of a technical trust which places the lawyer in a fiduciary capacity.").

[156] Disputed Facts, Docket No. 40 at ¶ 3.

[157] Joint Statement, Docket No. 46 at ¶ II.7; Disputed Facts, Docket No. 40 at ¶¶ 1-2, 6, 8.

[158] Although the Plaintiff denies that the Studio Equipment was delivered to Carchidi as security for unpaid legal fees, he nonetheless agrees that Carchidi took possession of it in his capacity as a lawyer representing the Mancinellis and their business.

apply to him.  The Plaintiff posits the existence of "an express trust agreement,"[159] but there is nothing in the record to support his assertion.

The final question with respect to this exception is whether there was a "defalcation [or fraud] within the meaning of bankruptcy law."[160]  "Defalcation" is not defined in the Bankruptcy Code, but "may be presumed from a breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest."[161]  In *Bullock v. BankChampaign, N.A.*,[162] the Supreme Court of the United States held that a breach of a fiduciary duty does not amount to a defalcation under 11 U.S.C. § 523(a)(4) unless it includes

> a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior.[163]

Here, the Debtors used the Studio Equipment, but the record is inadequate to establish whether this constituted a knowing breach of Carchidi's fiduciary duty, or a "conscious[] disregard[] of a substantial and unjustifiable risk that his conduct . . . [would] violate a fiduciary duty."[164]  Indeed, the Debtors maintain that the Studio Equipment was installed in Carchidi's garage with Bruce Mancinelli's knowledge.  For this reason, the Plaintiff has not established that the Debtors committed fraud or defalcation while acting in a fiduciary capacity.

---

[159] Memorandum in Support of Plaintiff's Motion for Summary Judgment, Adv. Pro. No. 14-1073, Docket No. 32 at 5.

[160] *In re Fahey*, 482 B.R. at 687.

[161] *Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 20 (1st Cir. 2002).

[162] *Bullock v. BankChampaign, N.A.*, —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013).

[163] *Id.* at 1757.

[164] *Id.* at 1759-1760 (internal quotation marks omitted).

Next, embezzlement is defined as "the fraudulent conversion of the property of another by one who is already in lawful possession of it."[165]  A party objecting to a debtor's discharge on the basis of 11 U.S.C. § 523(a)(4) embezzlement must show: "(1) the property was rightfully in the possession of the debtor; (2) the debtor appropriated the property for a use other than which it was entrusted; and (3) the circumstances indicate fraud."[166]  Fraudulent intent can be established by a showing of scienter—i.e., that the debtor knew he was converting the property for an unauthorized use.[167]  Larceny, on the other hand, is distinguishable from embezzlement in that the debtor's acquisition of the property was unlawful.[168]

The parties agree that the Mancinellis voluntarily delivered the Studio Equipment to the Debtors, thus negating a finding of larceny but establishing the first element of embezzlement. Nevertheless, for essentially the same reason that the Plaintiff cannot establish a defalcation, he cannot on the limited record before me prove an embezzlement.  As previously stated, it is unclear whether the Studio Equipment was delivered as collateral for unpaid legal fees and whether the Debtors were permitted to use it while in their possession.  Until these genuine issues of material fact are resolved, I am unable to determine if the Debtors' use and retention of the Studio Equipment amounted to a conversion.

Accordingly, the Plaintiff is not entitled to judgment as a matter of law under 11 U.S.C. § 523(a)(4).

---

[165] *Sherman v. Potapov (In re Sherman)*, 603 F.3d 11, 13 (1st Cir. 2010) (*quoting United States v. Young*, 955 F.2d 99, 102 (1st Cir.1992)).

[166] *Lento v. Marshall (In re Marshall)*, 497 B.R. 3, 12 (Bankr. D. Mass. 2013) (internal quotations omitted).

[167] *See In re Sherman*, 603 F.3d at 13.

[168] *Farley v. Romano (In re Romano)*, 353 B.R. 738, 765 n.10 (Bankr. D. Mass. 2006) (*citing Consumer United Ins. Co. v. Bustamante (In re Bustamante)*, 239 B.R. 770, 777 (Bankr. N.D. Ohio 1999)).

3. Nondischargeability under Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity . . . ."[169] In *Kawaauhau v. Geiger*, the United States Supreme Court explained that the word "willful," as used in 11 U.S.C. § 523(a)(6), "modifies the word 'injury,'" indicating that nondischargeability under that section therefore requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[170] "Thus, recklessly or negligently inflicted injuries are not excepted from discharge under [11 U.S.C.] § 523(a)(6)."[171] The malice element of 11 U.S.C. § 523(a)(6), in turn, requires the creditor to show that the injury was caused "without just cause or excuse."[172]

Unlike the prior counts, the Plaintiff's claim under 11 U.S.C. § 523(a)(6) encompasses conduct beyond the disposition of the Studio Equipment. Nevertheless, the Plaintiff has failed to demonstrate any of the requisite elements. First, with respect to the Studio Equipment, the record does not establish that the Debtors' intended to harm the Plaintiff or that they knew such harm was substantially certain to occur from their failure to accede to Bruce Mancinelli's demand that it be returned. Moreover, if the Studio Equipment was delivered to secure unpaid legal fees owed to Carchidi, the Debtors' retention of it may not have been without just cause or excuse. Second, with respect to the Brockton Action, which the Debtors admit was dismissed as "baseless and filed in bad faith," it is unclear that "bad faith" in this context amounts to

---

[169] 11 U.S.C. § 523(a)(6).

[170] *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998).

[171] *Trenwick Am. Reinsurance Corp. v. Swasey (In re Swasey)*, 488 B.R. 22, 34 (Bankr. D. Mass. 2013) (*citing Kawaauhau v. Geiger*, 523 U.S. at 64).

[172] *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997).

willfulness, rather than a recklessness.[173]  If, for example, Carchidi simply should have known that the Mancinellis did not owe him any legal fees at the commencement of the Brockton Action, but did not due to negligent accounting, then any injury the Plaintiff sustained would not be excepted from discharge under 11 U.S.C. § 523(a)(6).  Thus, the Plaintiff has not proven that he is entitled to judgment under 11 U.S.C. § 523(a)(6).

## V. CONCLUSION

In light of the foregoing, I will enter an order denying the motions for summary judgment.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: June 8, 2015

Counsel Appearing:

Brian Aylward, Smith, Levenson, Cullen & Aylward, PC, Peabody, MA,
    for the Plaintiff
Gary W. Cruickshank, Boston, MA,
    for the Debtors

---

[173] Joint Statement, Docket No. 46 at ¶ II.21.